IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,          :
                                   :
          Plaintiff,               :
                                   :
     v.                            : Criminal Action No. 08-112-JJF
                                   :
JOSHUA D. TARBURTON,               :
                                   :
          Defendant.               :


David C. Weiss, Esquire, Acting United States Attorney and John C.
Snyder, Esquire, Assistant United States Attorney, of the OFFICE
OF THE UNITED STATES ATTORNEY, Wilmington, Delaware,

Attorney for Plaintiff.

Eugene J. Maurer, Jr., Esquire, of EUGENE J. MAURER, JR., P.A.,
Wilmington, Delaware.

Attorney for Defendant.


                          **MEMORANDUM OPINION**


April $\mathcal{q}$, 2009
Wilmington, Delaware

**Farnan,** ~~Joseph J. Farnan~~ **District Judge.**

Pending before the Court is a Motion To Suppress Evidence (D.I. 16) filed by Defendant, Joshua Tarburton. For the reasons discussed, the Court will grant Mr. Tarburton's Motion.

## I. BACKGROUND

On July 24, 2008, Defendant, Joshua Tarburton, was indicted on three counts of possession of explosive devices or illegal firearms in violation of 26 U.S.C. §§ 5861(d) and 5871. On October 1, 2008, Mr. Tarburton filed the instant Motion. The Court conducted an evidentiary hearing on January 14, 2009, and counsel stipulated to a briefing schedule for the Motion. On February 27, 2009, briefing on the pending Motion was completed.

By his Motion To Suppress, Mr. Tarburton contends that the search of his residence was unlawful. Specifically, Mr. Tarburton contends that his mother gave consent to Corporal Young to search his residence for purposes of checking on his welfare, but that the police exceeded the scope of that consent when Detective Getek conducted a second search during which she opened and searched a closed, gray, unmarked tackle box found on the floor of his closet. The discovery of pipe bombs inside the tackle box led the officers to secure a search warrant for the entire premises, which in turn, led to the discovery of additional incriminating evidence against Mr. Tarburton.

The Government has filed a response to Mr. Tarburton's Motion To Suppress contending that the circumstances of the consent to search demonstrate that the consent given by Mr. Tarburton's parents included a search for firearms, which would reasonably extend to sealed containers on the premises such as the tackle box. The Government further contends that the search of containers in the residence was justified by the community caretaking doctrine, also known as the emergency aid or assistance doctrine.

## II.  FINDINGS OF FACT

1.    On the afternoon of May 28, 2008, Corporal Robert Shane Young, a seven year veteran of the City of Milford Police Department, was contacted by his Shift Sergeant, Sergeant Jefferson.  (D.I. 21 at 2-3.)  Sergeant Jefferson asked Corporal Young to meet him at the parking lot of the Church of God regarding a "check on the welfare complaint."  (Id. at 3.) Corporal Young responded along with two other officers, PFC Boney and PFC Gordon.  (Id.)

2.    Sergeant Jefferson advised the responding officers that he received a complaint that Joshua Tarburton had sent an e-mail to his ex-girlfriend suggesting that he might commit suicide. (Id. at 3-4.)

3.    Corporal Young knew Mr. Tarburton from high school, as well as from a prior incident in which Mr. Tarburton had

2

accidentally shot himself in the hand with a handgun. (<u>Id.</u> at 4, 15.)

4.    The officers, in full uniform and marked vehicles, arrived at Mr. Tarburton's residence, a three story Victorian style home, and knocked on the doors and windows and yelled out, in an attempt to make contact with Mr. Tarburton. (<u>Id.</u> at 5, 16.)

5.    Corporal Young observed a vehicle parked in the driveway, which heightened his concern that someone was in the residence, but not responding. (<u>Id.</u> at 5.)

6.    Corporal Young went over to the adjacent residence, which he knew to be the residence of Mr. Tarburton's parents and knocked on the door. (<u>Id.</u> at 6.) Mrs. Tarburton, Joshua Tarburton's mother, answered the door. (<u>Id.</u>) Corporal Young explained that he had received a call from Mr. Tarburton's girlfriend who received an e-mail from Mr. Tarburton containing statements of a suicidal nature and that there was a concern that he might be in the residence harmed or contemplating harming himself. (<u>Id.</u> at 6, 17.) He asked Mrs. Tarburton if she had a key to the residence, and if they could go in and check the residence to see if Mr. Tarburton was okay. (<u>Id.</u> at 6, 17-18)

7.    Mrs. Tarburton, who had a key to the residence, was visibly concerned and agreed to let the officers in. (<u>Id.</u> at 7.) She did not tell the officers anything about the possible whereabouts of her son, did not indicate that she was without the

3

authority to consent to the search, did not place any restrictions on the officers, and waited at the rear of the residence as she was instructed by the searching officers. (Id. at 7, 18, 29.)

8.    At no time prior to entering the house and obtaining Mrs. Tarburton's consent to search did Corporal Young inquire as to what Mrs. Tarburton's relationship to the residence was or whether her son was renting the home or living there with her permission. (Id. at 19.) However, in his police report prepared after the incident, Corporal Young noted that Mrs. Tarburton and her husband were the owners of both their residence and the residence in which Mr. Tarburton resided. (Id.)

9.    Corporal Young confirmed during cross-examination that he made it clear to Mrs. Tarburton that he was looking for her son's body at that point in time and nothing more. (Id. at 20.)

10.   Upon entering the house, the officers had their weapons drawn at the low-ready position because of their concern from past training that suicidal subjects can be homicidal. (Id. at 8.)

11.   The officers checked the ground floor of the residence, and after determining that no one was present there, proceeded to the second floor. (Id. at 8-9.) On the second floor, Corporal Young and PFC Lourde entered a room. Corporal Young noticed that the room was very cluttered in comparison to the neat appearance of the first floor. He rounded a corner of the room and saw a closet door partially opened. (Id.) In the estimation of

4

Corporal Young, the closet was large enough to contain a body.
(Id. at 29.) He looked through the partial opening in the closet,
without having to open it further, and observed on the floor, in
plain view, a black and white box. The box was marked with the
word "Taurus" on the outside. Having been the owner of similar
weapons, Corporal Young noticed the box immediately and recognized
it to be a handgun box. (Id. at 9-10, 22.)

12. Knowing that Mr. Tarburton might be suicidal, Corporal
Young was concerned that if the handguns weren't in the box, then
Mr. Tarburton might be armed. (Id. at 10, 30). He opened the box
to check it and found that no handgun was in the box. (Id.)

13. Adjacent to the Taurus box, Corporal Young observed a
black InterTech pistol handgun case. He checked that box, and
found no gun inside. (Id. at 10.)

14. At this point in time, Corporal Young had no concern
that Mr. Tarburton might be possessing the guns illegally, because
he was unaware of any prior felony convictions. (Id. at 23.).
However, Corporal Young testified that the absence of the guns
gave him "good reason" to believe that Mr. Tarburton might be
armed. (Id. at 30).

15. Corporal Young and PFC Lourde proceeded to the third
floor and determined that no person was present there. Corporal
Young noticed a small closet in the room, which contained some
type of martial arts paraphernalia and a video camera. On the

5

back part of the room, he noticed some nose .22 caliber bullets lined up in a few rows on a shelf. (Id. at 10-11.)

16. After completing the search, the officers were unable to locate Mr. Tarburton in the residence.[1] (Id. at 11.) As a result, they determined that he was not in the house, not committing suicide there, and not threatening anyone. (Id. at 21-22, 26.)

17. After this initial search, the officers went back downstairs to meet with Detective Getek, who had been called to the scene with her partner, Detective Sapp. (Id. at 32.)

18. Corporal Young observed Detective Getek speaking with Mrs. Tarburton. Mr. Tarburton, the father of Defendant Joshua Tarburton, also arrived on the scene.[2] (Id. at 11, 32.)

19. Detective Getek learned that the officers had found a letter written by Mr. Tarburton to his parents, his personal Blackberry, a key to his parents' residence, and a key to a Chevy Nova that he was restoring. (Id. at 33.) Detective Getek testified that she spoke to Mr. Tarburton's parents, who were both concerned and anxious. (Id. at 33.) Mr. Tarburton's parents

---

[1] Corporal Young testified that he knew there was a basement to the residence, but that he did not check the basement and was unaware if it was checked by the other officers. (Id. at 21.)

[2] For ease of reference and to avoid confusion, the Court will refer to the father of Defendant Joshua Tarburton as "Mr. Tarburton, Sr."

6

explained that their son had some problems in the past and that he could have gone to a place called Cranberry Blade Park. They indicated that the day before, he had withdrawn money from a personal bank account and that he was supposed to have been at work, but never showed up. Mr. Tarburton's parents also suspected that he might have gone to West Virginia. (Id. at 33-36.)

20. Mr. Tarburton's parents also discussed his mental health with Detective Getek, explaining that he had disappeared one time in the past and they were concerned. At that time, his parents discovered that he had checked himself into Dover Behavioral Health, a psychiatric facility in Dover. Upon learning this information, Detective Getek had her dispatcher contact Dover Behavioral Health to determine if Mr. Tarburton was there. (Id. at 34, 36.) During both this conversation and a later conversation with Mr. Tarburtons' parents, Detective Getek learned additional information about Mr. Tarburton including when he was last seen by his parents, that he had been diagnosed with clinical depression, and the circumstances of his relationship with his ex-girlfriend. (Id. at 35-36.)

21. At some point following this conversation, Detective Getek learned from Corporal Young that he had found empty handgun cases upstairs. Detective Getek left the scene for a few minutes to go to the police station to get her assigned car. (Id. at 51.) When she returned, Detective Getek discussed the firearms with Mr.

Tarburton's parents and learned that he was a gun collector.[3] According to Detective Getek, she then indicated to Mr. Tarburton's parents that she needed to go back next door to Mr. Tarburton's residence to check the items that were discovered and look around because "a lot of times there are things that I can see." (Id. at 37.)

22.  The Tarburtons raised no objection, and Detective Getek took this to mean that they had consented to her searching the residence, but she conceded on cross-examination that she never specifically asked for the Tarburtons' permission to go back into the house.  (Id. at 37, 53.)

23.  Mr. Tarburton, Sr. followed Detective Getek over to Mr. Tarburton's residence.  (Id. at 38.)  Upon returning to the house, Detective Getek looked around the kitchen and saw some medicine bottles.  (Id.)  At one point, a question came up concerning where guns might be in the house, and Mr. Tarburton, Sr. went to an alcove off the kitchen covered by a curtain.  He moved the curtain back and pulled out a long, green army duffle bag.  He opened up the bag and found two long guns in the bag, which he turned over

---

[3]     The Court notes some confusion in the transcript concerning the precise timing of when Detective Getek learned about the missing firearms, but it appears from the testimony that whenever this information was learned, she discussed it with Mr. Tarburtons' parents at some point prior to her reentering the house.  In the Court's view, the precise timing of her knowledge does not have a significant impact on this case, but rather, it is the substance of her conversations with the Tarburtons' and their actions and reactions that are most important.

to Sergeant Jefferson.  (Id. at 39.)

24.  In the proximity of Mr. Tarburton, Sr., Detective Getek
then asked Corporal Young to show her where the handgun cases were
found.[4]  (Id. at 39.)  Detective Getek testified that she wanted
to continue looking for the firearms to try to account for them.
(Id. at 40.)

25.  At no time prior to going back upstairs with Detective
Getek did Corporal Young approach Mrs. Tarburton for any
additional consent or authorization to search.  (Id. at 27-28.)

26.  Corporal Young took Detective Getek to the second floor
room where the handgun cases were located.  Behind the handgun
cases was what Corporal Young described as a fishing-type tackle
box, and behind that a smaller tackle box.  (Id. at 12-13.)

27.  Detective Getek testified that she believed these boxes
"appeared . . . to be like a gun cleaning kit, things that I've
seen in the past, indicative of a gun cleaning kit but large
enough that it might actually have a weapon in it."  (Id. at 41.)

28.  Detective Getek opened the box and saw pipes capped off,
galvanized and wires that were duct-taped.  (Id. at 13, 41.)
Recognizing the pipes as possibly some type of explosive device,

---

[4]      There was also some discrepancy in the testimony
concerning the timing of when Detective Getek learned of the
missing handguns and when she went upstairs to look at the empty
cases.  Ultimately, however, Corporal Young could not remember if
Detective Getek talked to the Tarburtons in between learning of
the gun cases and going to see them or not.

Corporal Young and Detective Getek went back downstairs and evacuated the residence. (Id. at 41.)

29. The discovery of these pipe bomb type devices was the first indication that Corporal Young and Detective Getek had that something illegal was on the premises. (Id. at 29.)

30. Corporal Young also testified that up until the time that he found the explosive devices, the purpose of the search was only to check on Mr. Tarburton's welfare and not to conduct any criminal type of investigation. (Id. at 14.) Stated another way, the investigation was a missing person investigation until the pipe bombs were discovered. (Id. at 24). Detective Getek agreed with Corporal Young's testimony that their investigation was initially a missing person investigation. (Id. at 43.)

31. Sergeant Getek went back downstairs and asked Mr. Tarburton, Sr. if his son had a fascination with explosive fireworks, and he said yes. (Id. at 41.) Detective Getek indicated that they had found something upstairs and needed to evacuate the house. (Id.) At that point, she contacted her immediate duty officer and advised him that they needed to get an ordinance in to clear the house. (Id. at 41-42.)

32. Detective Getek issued an Eastern Seaboard "Be On The Lookout" report that they were looking for Joshua Tarburton, who might be in possession of a firearm. (Id. at 42.)

10

33. Mr. Tarburton's mother, Linda Tarburton, also testified at the evidentiary hearing. Mrs. Tarburton testified that her son lived next door in a home that she and her husband owned. (Id. at 60.) Mr. Tarburton did not pay rent and did not occupy the premises pursuant to a written agreement. Rather, he orally agreed to perform some household work for his parents, like cutting the grass and shoveling the snow, in exchange for being allowed to occupy the premises. (Id. at 60-61.)

34. Mrs. Tarburton had a key for her son's residence, but testified that the key was for emergencies only and that she and her husband did not go in and out of the house. (Id. at 61.)

35. Mrs. Tarburton further testified that she was contacted by police regarding the e-mail her son sent to his ex-girlfriend. She stated that the police asked her if she owned the property next door and had a key, and she responded affirmatively to both questions. (Id. at 61-62.)

36. Mrs. Tarburton also testified that Corporal Young wanted to go in the residence to check on her son's welfare and that he asked if he could go into the residence, and she agreed because the officers were not allowing her to enter the premises. (Id. at 62.) Mrs. Tarburton testified that she told Corporal Young that she didn't think her son was home, because she had seen his car go down the driveway that morning. (Id. at 63.)

11

37.  According to Mrs. Tarburton, she did not see Detective Getek at the house until she came to interview them.  (Id. at 63-64.)  Mrs. Tarburton testified that Detective Getek never requested permission to go back into the house and never indicated to her that she was going back into the house to look around or pickup the things that had been found inside.  (Id. at 66.)

38.  Mrs. Tarburton testified that she consented to a search of the house for her son's body, "[a]nd that was it."  (Id. at 67.)

39.  On cross-examination, Mrs. Tarburton testified that she wanted the officers to go in the house to check on her son.  (Id. at 68.)  She also testified that she didn't know anything about guns in the house, except that she "knew he had one gun."  (Id. at 69.)

## III. CONCLUSIONS OF LAW

1.  As a threshold matter, Mr. Tarburton has indicated in his post-evidentiary hearing Response to the Government's Proposed Findings Of Fact And Conclusions Of Law that he does not object to Corporal Young's initial entry into his premises.  Mr. Tarburton also concedes that Corporal Young's initial entry was authorized by his mother's consent.  (D.I. 28 at 7.)

2.  Mr. Tarburton also does not contest the initial opening of the plainly marked gun boxes by Corporal Young, because the opening of those boxes was a proper extension of a "check on

12

welfare" sweep.  (Id.)

3.   Mr. Tarburton's sole argument is that Detective Getek violated his Fourth Amendment rights by opening the closed, unmarked tackle box, which resulted in the discovery of the pipe bomb and served as the basis for obtaining the search warrant which led to the discovery of additional incriminating evidence. (Id.)

4.   The Fourth Amendment to the United States Constitution protects "the right of the people to be secure against unreasonable searches and seizures. . . ."  U.S. Const, amend IV.

5.   Generally, a warrantless entry into a person's house is per se unreasonable, and therefore, a violation of the Fourth Amendment.  Payton v. New York, 445 U.S. 573, 586 (1980); Coolidge v. New Hampshire, 403 U.S. 443, 454-455 (1971).

6.   "[O]ne 'jealously and carefully drawn' exception . . . recognizes the validity of searches with the voluntary consent of an individual possessing authority."  Georgia v. Randolph, 547 U.S. 103, 109 (2006) (citations omitted).

7.   Consent to a search must be voluntary, but may be "express or implied, and need not be knowing or intelligent." Schenckloth v. Bustamonte, 412 U.S. 218, 235 (1973); U.S. v. Lockett, 406 F.3d 207, 212 (3d Cir. 2005).  In determining whether consent was voluntarily given, the Court must consider the totality of the circumstances.  Id. at 227.

8.    "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness." Florida v. Jimeno, 500 U.S. 248, 251 (1991). In this regard, the Court must inquire as to what the typical reasonable person would have understood by the exchange between the officer and the suspect," or in this case, the person giving authorized consent. Id.

9.    "The scope of a search is generally defined by its expressed object." Id. The party consenting to a search "may of course delimit as he [or she] chooses the scope of the search to which he [or she] consents. But if his [or her] consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization." Id.

10.   The Government bears the burden of demonstrating that consent to search was given by a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 177 (1974).

11.   Reviewing the circumstances of this case, the Court concludes that Mrs. Tarburton's initial consent to Corporal Young's search of the premises extended only to a search for the purpose of checking on the welfare of her son. Defendant concedes this search could include, by extension, a search into the clearly marked gun cases lying in plain view of the officers in a partially opened closet on the premise that the absence of those

14

guns in the case could raise the additional concern that Mr. Tarburton possessed those guns with an intent to kill or injure himself or others. However, once the officers determined that Mr. Tarburton was not on the premises, the initial sweep search ended[5], and the Court must determine whether additional justification existed for the further warrantless search by Detective Getek.

12. The testimony is contradictory as to whether Detective Getek indicated to the Tarburtons that she intended to "look around" the premises. According to Mrs. Tarburton, Detective Getek made no such statements to her. However, even if the Court accepts the Government's position that Detective Getek explained to the Tarburtons that she would be returning to the residence to "look around," the Court cannot conclude that the Tarburtons' silent acquiescence to Detective Getek's statement amounted to voluntary consent to search the premises. Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968) (the government's burden of showing consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority"). As Detective Getek testified, she did not request the permission of the Tarburtons to

_____

        5       In this regard, the Court notes that Corporal Young
confirmed that he had good reason to believe that Mr. Tarburton
was armed as a result of his discovery of the missing handguns,
but that he also concluded that Mr. Tarburton was not in the
residence, was not committing suicide there and was not
threatening anyone.

15

return to the residence and only stated in a matter-of-fact manner
that she would be doing so.

13.    That Mr. Tarburton, Sr. followed Detective Getek back to
the residence also does not establish implied consent to search in
the Court's view.   In fact, it is telling to the Court that Mr.
Tarburton Sr. followed behind, which suggests that he was not
leading Detective Getek back to the residence to allow her to
reenter, but rather, was following behind her on her show of
authority.

14.    However, even if the Court concludes that Mr. Tarburton,
Sr.'s actions in accompanying Detective Getek back to the
residence and his presence in the kitchen while she was looking
around demonstrates that Mr. Tarburton, Sr. impliedly consented to
Detective Getek's presence at the residence for the purposes of
"looking around," the Court cannot conclude that this implied
consent to enter the premises and broadly "look around" translates
into a consent to search sealed containers in the house.

15.    The Government contends that Mr. Tarburton, Sr. knew the
police were looking for the missing firearms as evidenced by his
conduct in:   (1) finding additional firearms in a duffle bag and
turning them over to police, and (2) not expressing any objection
to Detective Getek's request, made in the proximity of Mr.
Tarburton, Sr. that the officers were going upstairs to look at
the empty handgun boxes.   According to the Government, this

16

conduct is sufficient to establish implied consent to a search of the tackle box by Detective Getek.

16. The Government's burden, however, in the circumstances of implied consent to search is higher than in express consent cases. U.S. v. Moreland, 437 F.3d 424, 429 (4th Cir. 2006). In the circumstances of this case, the Court is not persuaded that the Government has established by a preponderance of the evidence that the Tarburtons' gave Detective Getek implied consent to search sealed containers in the residence, even if broad consent was given for Detective Getek to "look around" the residence. Cf. Jimeno, 500 U.S. at 251-252 ("It is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk, but it is otherwise with respect to a closed paper bag."). The record suggests that the Tarburtons knew that the police were "interested" in the missing handguns, but it is unclear to the Court whether it was communicated to the Tarburtons that a search was being conducted for the missing firearms. In fact, Detective Getek admitted that she "wasn't specifically . . . looking for every single weapon that might be in the house," and it is unclear to the Court that Detective Getek's generic statement that she wanted to "look around" and view the items that had already been uncovered conveyed to the Tarburtons that she intended to conduct a more detailed search for firearms in the home. In this regard,

17

the Court finds the circumstances of this case to be distinguishable from those cases cited by the Government, because in those cases, the party giving consent was more specifically informed about the contours and purpose of the search. See, e.g. United States v. Stapleton, 10 F.3d 582, 584 (8th Cir. 1993) (consent implied where defendant remained silent when told of search and object of search); United States v. Kim, 27 F.3d 947, 956 (3d Cir. 1994) (suspect expressly consented to search of luggage for the purpose of finding narcotics).

17. In addition, the Court is unpersuaded that Mr. Tarburton, Sr.'s actions of searching the home, uncovering firearms and handing them over to police constitute an implied authorization for the police to take the same actions. In fact, that Mr. Tarburton, Sr. was the person aggressively conducting this type of search into sealed containers suggests the opposite, that he retained the authority to look into sealed containers inside the house and did not confer or share that authority with anyone else.

18. Further, the Court cannot conclude that Mr. Tarburton Sr.'s presence in the vicinity and subsequent inaction when Detective Getek asked Corporal Young to show her the empty gun cases demonstrates that Mr. Tarburton, Sr. consented to an additional search by Detective Getek. The record does not indicate whether Mr. Tarburton, Sr. heard Detective Getek's

18

request, and even if he did, the Court cannot conclude that the
Detective's desire to view already uncovered evidence would
indicate that she intended to conduct a search for additional
evidence.  In these circumstances, the Court is not persuaded that
the Government has established by a preponderance of the evidence,
that the Tarburtons consented to a search by Detective Getek of
sealed containers within the residence.

19.  The Court is also not persuaded that Detective Getek's
search of the premises was supported by the community caretaking
doctrine.  "A warrantless search must be strictly circumscribed by
the exigencies which justify its initiation."  Mincey v. Arizona,
437 U.S. 385 (1978).

20.  In this case, the initial emergency faced by police
officers involved determining whether a potentially suicidal
individual was in the home and in need of assistance.  This
emergency ceased to exist once officers determined that Mr.
Tarburton was not on the premises.

21.  The Government contends that an additional emergency
existed justifying Detective Getek's search of the premises.
Specifically, the Government expresses the concern that the public
required protection from an armed individual even though he was
not on the premises.  In this regard, the Government contends that
Detective Getek's "effort to locate the two firearms was a
reasonable and appropriate response to the perceived emergency, as

19

it was necessary to both verify the nature of the threat to the defendant and the public and ensure that the information provided in the missing person bulletin was as accurate as possible." (D.I. 24 at 21-22).

22. However, Corporal Young unequivocally testified that as soon as he observed that the guns were missing from their cases, he had sufficient information to conclude that Mr. Tarburton might be armed. In fact, Corporal Young further testified that sufficient information existed at this juncture to issue a teletype warning officers that Mr. Tarburton could be armed. (D.I. 21 at 24.) Further, Detective Getek was informed that Mr. Tarburton was a gun collector, and therefore, even if the two missing guns were located, there would be no assurance that Mr. Tarburton would be unarmed. Accordingly, in these circumstances, the Court cannot conclude that Detective Getek's additional search of the premises was justified by the community caretaking doctrine, because she was already in possession of ample information, as a result of Corporal Young's initial search, to protect the public for the purposes described by the Government.

## IV. CONCLUSION

For the reasons discussed, the Court will grant Mr. Tarburton's Motion To Suppress.

An appropriate Order will be entered.